**Lisa R. ARASTEH, Plaintiff,**

v.

**MBNA AMERICA BANK, N.A., Defendant.**

**No. 99–254–GMS.**

United States District Court, D. Delaware.

June 12, 2001.

---

Gary W. Aber, Heiman, Aber, Goldlust & Baker, Wilmington, DE, for plaintiff.

Sheldon N. Sandler, Barry M. Willoughby, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, for defendant.

## AMENDED MEMORANDUM OPINION

SLEET, District Judge.

## I. INTRODUCTION

On April 21, 1999, Lisa R. Arasteh filed a complaint against MBNA America Bank, N.A. ("MBNA") alleging, inter alia, two violations of Title VII of the Civil Rights Act of 1964, as amended, *codified at* 42 U.S.C. § 2000 et seq (D.I.1).[1] First,

---

1. Arasteh's original complaint also included claims of (1) sex and national origin discrimi- nation and (2) breach of an implied covenant of good faith and fair dealing. These claims,

she claims that she was sexually harassed by her supervisor. Second, she avers that MBNA retaliated against her for complaining of discrimination and sexual harassment. MBNA filed a motion for summary judgment on June 6, 2000 (D.I.84). Arasteh timely answered (D.I.102) and MBNA timely filed a reply brief (D.I.112).[2] Upon reviewing the record and considering the parties' submissions, the court will grant MBNA's motion for summary judgment on Arasteh's sex discrimination claim but deny it as to her retaliation claim since there are genuine issues of material fact regarding her transfer.

## II. STANDARD OF REVIEW

"Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact that can be resolved at trial and that the moving party is entitled to judgment as a matter of law." *House v. New Castle County*, 824 F.Supp. 477, 481 (D.Del.1993) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In evaluating whether there are any genuine issues of material fact, "[m]ateriality is determined by the substantive law that governs the case." *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202

(1986)). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *See id.* (internal quotations omitted). A dispute is "genuine" only if a reasonable jury could return a verdict for the nonmoving party. *See id.* When considering a motion for summary judgment, the court must view all facts and inferences in the light most favorable to the party opposing the motion. *See Stephens v. Kerrigan*, 122 F.3d 171, 176–77 (3d Cir. 1997). Moreover, "[i]f the evidentiary record supports a reasonable inference that the ultimate facts may be drawn in favor of the responding party, then the moving party cannot obtain summary judgment." *See House*, 824 F.Supp. at 481–82 (citing *In re Japanese Elec. Prod. Antitrust Litig.*, 723 F.2d 238, 258 (3d Cir.1983), *rev'd on other grounds*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Finally, at this stage of the process, "the judge's function is not himself [sic] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *See Lewis v. State of Delaware Dept. of Pub. Instruct.*, 948 F.Supp. 352, 357 (D.Del.1996) (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505) (internal quotations omitted).

---

however, were dismissed with prejudice via stipulation. *See* D.I. 83 and 108.

**2.** After requesting and receiving leave of the court, the parties filed supplemental answering and reply briefs on the issue of retaliation (D.I. 117 and 118). Subsequently, the parties submitted ten letters to the court between November 13, 2000 and May 11, 2001 (D.I. 120–129). Although the letters purportedly only discuss new authority issued after the close of briefing, the submissions are primarily additional argument on the applicable facts and law of the case. Local Rule 7.1.2(c) states, in pertinent part, "a party may call to the Court's [sic] attention and *briefly* discuss

pertinent cases decided after a party's final brief is filed or after oral argument" (emphasis added). Lengthy attorney argument regarding the meaning of cases and restatement of issues highlighted in the briefing is not allowed without specific leave of the court. The cumulative effect of the parties' letters is an abuse of Local Rule 7.1.2(c) and reflects a tit for tat which is largely unhelpful to the court in deciding the instant motion. Since both parties improperly submitted additional material, the court will only examine the letters to the extent they conform to the literal words of Local Rule 7.1.2(c).

## III. BACKGROUND

The record before the court is voluminous and describes actions over several years. Arasteh's removal of her sex discrimination and state law claims, however, significantly narrows the issues before the court. Therefore, the court will confine its statement of facts those which are pertinent to the allegations of sexual harassment and retaliation rather than detailing the entire relationship between the parties. Even with this limitation, however, this case—like all Title VII actions—is intensely fact driven and requires a lengthy background recitation. Although the court has not discussed all the facts and arguments identified by the parties, it has reviewed the record to the extent necessary.[3]

Arasteh began working for MBNA in March, 1988 as an Internal Control Analyst in the Compliance Section. Through the years, she advanced through the ranks and was eventually promoted to Vice President in 1994. Although she has worked in several different departments at MBNA, she joined Industry Relations—a newly created department—in October, 1995. Joseph Stemmy was the first head of the department.

### A. Sexual Harassment

In February, 1996, John Doe[4] replaced Stemmy as head of Industry Relations, making him Arasteh's manager. Arasteh claims that Doe began sexually harassing her soon after he became her manager. There is no record evidence that Arasteh contemporaneously recorded instances of sexual harassment by Doe.[5] Nevertheless, in deposition testimony Arasteh describes several instances of what she considered to be sexual harassment.[6]

3. Numerous courts have found that a district court need not "comb the record" on summary judgment in order to find a genuine issue of material fact which has not otherwise been brought to its attention by the party opposing the motion. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir.2001) (citing cases).

4. Subsequent to the publication of the court's memorandum opinion (D.I 132), MBNA requested that the court use a pseudonym to protect the privacy of the individual in question (D.I.133). The court does not believe that Arasteh has any objection. The court will therefore refer to Arasteh's former supervisor as "John Doe" throughout its amended memorandum opinion. Aside from the use of a pseudonym, this amended memorandum opinion is not materially different from the court's previous memorandum opinion.

5. At some point prior to Doe becoming the head of Industry Relations, Arasteh began keeping a contemporaneous work diary in Farsi (she was born in Iran) regarding incidents at MBNA. Arasteh provided her attorney with a translation which included "additional comments" which were not written in her diary. According to Arasteh, her entry for August 25, 1996 literally translates as "stupid idiot". Underneath the translation, Arasteh included additional comments stating "I had a meeting with Jim.... He was staring at me and touching my legs and it made me very uncomfortable.... I usually did not note these things. To me they were immaterial and I would handle them." Although MBNA had a portion of Arasteh's notes independently translated by an interpreter, his affidavit does not include a translation of Arasteh's August 26, 1996 entry. Rather than engage in semantic or credibility arguments, the court merely notes that neither party disputes the exact translation of the August 26, 1996 entry and that Arasteh has not provided any record evidence to suggest how or why the "additional comments" are implicit in her entry. Therefore, there is no record evidence of Arasteh describing any examples of sexual harassment in her contemporaneous work diary.

6. MBNA's brief provides more specific examples of sexual harassment allegations than does Arasteh's. *Compare* Pl.Br.Sum.J. at 6–8 *with* Def.Ans.Br.Sum.J. at 10–12. In addition, the "Sexual Harassment Questionnaire" Arasteh filled out for the Equal Employment Opportunity Commission ("E.E.O.C.") includes still more alleged incidents. The only

First, Arasteh claims that while on a business trip to Purchase, N.Y. in April, 1996, Doe generally inquired about her relationship with her husband and told her that he had been married for five years. During the conversation, Arasteh testified that Doe said, in substance, "[a]fter five years, it's [sic] kind of more friendship than a marital [relationship]".[7] Arasteh stated at her deposition that she believed this exchange constituted sexual harassment. After the trip, Arasteh felt that Doe's attitude toward her changed; he would call her into his office frequently to ask her questions. At his deposition, Doe denied that he has ever had a conversation with Arasteh about her husband and specifically denied such a conversation during the April, 1996 business trip.

Second, Arasteh claims that since she was the only employee in the department, Doe made her feel uncomfortable since he "kept asking me to lunch". Although she attended "work-related lunches" with Doe and association representatives, Arasteh stated that she never went to lunch alone with Doe. Arasteh also testified that Doe also told her that she "should learn to socialize because this is a marketing environment and you have to be friendly with people." Doe does not appear to dispute that he asked her to lunch or made a comment about her socializing.

Third, Arasteh testified that Doe rubbed her legs with his legs under the table at an unspecified number of meetings. About six months after Doe's arrival in Industry Relations, Arasteh stated that she began arriving at meetings late so as to avoid having to sit next to Doe.[8] Despite employing this avoidance tactic,[9] she would sometimes wind up sitting next to Doe, but it "didn't [sic] happen often." Although Arasteh testified that Doe rubbed her legs on one occasion "[i]n 1997," it appears that the rest of the incidents occurred between May and December, 1996. Arasteh also stated that Doe would stare at her chest and breasts, making her feel uncomfortable. The record is not clear when these incidents occurred, but it appears from Arasteh's deposition that these incidents occurred around the same time as the leg rubbing during meetings.[10] Arasteh testi-

---

allegations not mentioned below which could be construed as sexual harassment are (1) on April 26, 1996, Doe asked Arasteh to buy flowers for his secretary and (2) an undated allegation that one night on a business trip to St. Louis, Missouri with Doe and others, Arasteh heard a knock at her hotel room door around midnight. Since Arasteh "had a feeling it was [Doe]" she did not open the door. The rest of the allegations deal more with the effects of the other alleged incidents. Indeed, Arasteh cites many of these incidents (also mentioned in the "Sexual Harassment Questionnaire") as examples of retaliation by Doe for rejecting his alleged sexual advances. *See* Def.Ans.Br.Sum.J. at 13.

7. Later in her deposition, Arasteh said her response to the comment was "I made a joke out of it. I said, Well, [sic] Jim, I guess we're [Arasteh and her husband] still in the first five years...." According to Arasteh, that was the end of the conversation "[o]n that topic."

8. Although Arasteh does not give a date, Doe began working in Industry Relations in February, 1996. Based on Arasteh's testimony, it is logical to assume that she did not begin her avoidance strategy until at least August, 1996.

9. Arasteh's co-worker, Eric R. Nelson, stated that Arasteh was often the last to arrive at meetings. Arasteh testified that her "strategy" was to wait outside the meeting room until everyone else was seated and then enter.

10. At his deposition, Nelson testified that "Jim had a tendency to stare at [Arasteh] for whatever reason, when we would be in meetings, and I have no idea why." He characterized Doe staring as opposed to "just letting his eyes wander the room." Nelson also stated that Arasteh once told him that she had to sit next to Doe in a meeting, and that he had rubbed her leg "continually". Nelson does not supply the date of the incident or the conversation.

fied that she did not remember if Doe stared at her breasts in 1997.

Fourth, Nelson testified that Doe indirectly asked him if Arasteh was a lesbian. At his deposition, Nelson stated, "[h]e [Doe] had made kind of a, I thought it was a rude comment outside the men's room in the hallway ... he said something that he didn't [sic] know what was wrong with ... [Arasteh], that he thought she might be a lesbian." Although Nelson could not recall the specific context of the comment, he stated "it was a kind of a guy type of a thing" and the conversation was generally about women in the office. Arasteh was not present during the discussion, but Nelson told her about it afterwards since he thought it unusual. Nelson does not provide a date of this incident.

The record also contains several other vague and undated references to alleged sexual harassment. Arasteh testified that Doe "would talk about the color of my clothes" and that certain outfits looked good on her. Although Doe did not specifically deny each and every allegation of sexual harassment, he stated at his deposition that her "whole harassment suit" was untrue.

Arasteh stated that she spoke to Doe about his sexual harassment in June, 1996. According to Arasteh, after their conversation Doe's sexual harassment turned into "abusive treatment." Arasteh claims this treatment manifested itself in several ways. First, Doe told her to do things that "belittled" her in meetings. Second, he suggested that she not move to a different department since she would get promoted faster in Industry Relations (she never got promoted). Third, in her 1997 "year end" evaluation, Doe "downgraded" her overall performance level from the "superior" rating she received in her 1996 year end evaluation to "excellent". Although in absolute terms this may be lower, it is not clear what impact the June, 1996 conversation had on her evaluation; a longer and more complete look at her reviews suggest an up and down pattern.

In her "mid year" 1997 "Officer Goal Assessment," Arasteh received two "exceeded" ratings and two "achieved" ratings in the "Results and Assessments" category and three "superior" and six "excellent" ratings in the "Management Factors" category. Her overall performance level was "achieved." In her 1997 year end review, Arasteh received three "exceeded" and one "achieved" ratings in the "Results and Assessments Category" and one "superior," seven "exceeded," and one "good" in the "Management Factors Category". Her overall performance level was "exceeded." In 1996, Arasteh received a "excellent" for overall performance at her mid year and an "superior" at year end. Although it is true that Arasteh's overall evaluation went from "superior" at the end of 1946 to "exceeded" at the end of 1997, her interim performance evaluations (mid 1996 and mid 1997) were lower than her year end evaluations. Therefore, it is not clear that Arasteh's claimed confrontation with Doe in June, 1996 was the reason for the lower review at the end of 1997.

Fourth, Doe told Arasteh to attend an "Elements in Writing Class" even though she had previously attended it and had received high evaluations on her written communications skills. While directing Arasteh to attend a "basic" class, he denied her request to attend a management level seminar.[11]

---

11. Although Arasteh states Doe's actions are examples of retaliating against her for her June, 1996 conversation, she discusses them in her deposition in the context of gender discrimination and her retaliation claims. *See* note 6, *supra*.

There is a bit of a dispute over whether Arasteh properly utilized MBNA's sexual harassment policies. The record does indicate, however, that during the time of the alleged incidents Arasteh did not file a formal grievance with MBNA. At her deposition, Arasteh testified although she regarded Doe's "lesbian" query to Nelson as inappropriate, she did not file a complaint since "[y]ou have to keep in mind that I am a vice-president of the company, it wouldn't have looked appropriate for me to walk into personnel every time Mr. [Doe] touched my legs or made comments like this." At another point in her deposition, Arasteh stated she did not talk to the personnel department because she "did not feel it would be appropriate at my level, as an officer of the company, to go to a personnel office. I didn't [sic] want to end my employment at MBNA. I wanted to address the problems that I had."

Additionally, Arasteh claims to have had a general conversation with Peter A. Dimsey, Doe's superior, regarding the harassment. She did not, however, testify that she informed Dimsey of specific times or incidents. Finally, although she sent a letter to senior management at MBNA detailing various instances of alleged discrimination, she did not expressly complain about sexual harassment by Doe.

The parties spend much time discussing Arasteh's job performance and attendance in Industry Relations during 1997. Arasteh and MBNA read different motivations in requiring her to sign out and having MBNA staff keep track of her whereabouts. MBNA attributes Arasteh's actions in 1997 to "signs of psychic impairment." Arasteh vehemently denies that any psychiatric or medical problems interfered with her work and states that

MBNA is attempting to smear her. Although the parties dispute the cause, it is clear that Arasteh had several important issues in her life that either distracted her at work or caused her to be absent. For example, her father had medical problems that required her attention and she has medical problems that necessitated enrollment at a MBNA physical therapy facility. Additionally, she had to care for her young children. Regardless of whether MBNA's "precepts" regarded these circumstances as legitimate reasons for not being at work, both parties appear not to dispute that Arasteh was occasionally out of her office during regular business hours. Finally, although the parties contest the extent and the reasons for the absences, there is no disagreement that there were several of them.

## B. Retaliation

On January 8, 1998, Arasteh sent MBNA Senior Vice Chairman Lance Weaver a personal and confidential memorandum through interoffice mail detailing both general and specific events from 1995 until approximately August, 1997 that demonstrate that she was treated "unfairly" in violation of MBNA "precepts." The memorandum's stated intent was to "provide [Weaver] with some insight into the current environment." At the conclusion of the memorandum, Arasteh states "I also recommend that you share this information with our Legal [sic] department as I feel there are situations which deviates [sic] from various Labor Law [sic] requirements." Although Arasteh showed Nelson a copy of the letter and he was with her when she put it in the mail, Weaver claims that he never received it.[12] Indeed, he testified at his deposition that he was not

---

12. At his deposition, Weaver stated that he was generally familiar with the contents of Arasteh's memorandum and his impression was "that I certainly would have remembered receiving it."

aware of the memorandum until after the instant lawsuit was filed.[13]

Shortly after Arasteh sent her memorandum to Weaver, her former attorney sent MBNA's Chief Executive Officer, Charles Cawley, a letter on Arasteh's behalf on January 21, 1998. Like the original complaint filed with the court, the letter describes broader allegations than the ones currently asserted in this case; it focuses on sex and national origin discrimination. The letter, however, does not mention sexual harassment explicitly.[14] The letter concludes, "[w]hile she does not wish to make the reason for her leaving public, my client [Arasteh] has given me the authority to file a complaint with the State Labor Board and the Equal Employment Opportunity Commission Office. To bypass these options, my client has also given me the authority to attempt to negotiate a settlement with MBNA, [sic] that would place her as close to the position she would be in if MBNA's discriminatory practices had never existed."

Upon reading the January 21 letter, Cawley gave it to Weaver—who was in Cawley's office at the time "just by coincidence"—to read since he was Arasteh's "first removed supervisor" (Doe was her direct supervisor). After questioning Weaver "a little bit" about Arasteh, Cawley called Ken Boehl to his office. Boehl was involved in the discussion because of his background and his familiarity with Arasteh—he was her former supervisor. Although he could not remember the specifics of the meeting, Weaver stated that Cawley was "confused and frustrated" with the letter and expressed a desire to look into the allegations. According to Weaver, Cawley did not seem concerned about Arasteh's well being. Basically, the meeting consisted of Cawley asking Weaver and Boehl questions about Arasteh. Apparently, Doe was not present since he was "accused of doing some things that were wrong."

According to Weaver, the January 21 letter "was turned over immediately to our legal department and, beyond that ... [he] was not involved in the investigation." Weaver stated that he believed the reason for this was that generally "[once] someone goes to a lawyer, it is turned over to the legal department."[15] Weaver is not aware of any further discussions about the letter or Arasteh's allegations after the matter was referred to the legal department. Furthermore, he testified that he

13. Although MBNA's Vice President in charge of Mail Services could did not specifically testify regarding Arasteh's memorandum to Weaver, he stated that mail is generally reported as not received either because it was never mailed or it is received but forgotten.

14. The only allegation in the letter that could be taken as a complaint about sexual harassment is an alleged comment by Doe that "it is the wife's responsibility to take care of 'home' matters." In context, however, the court does not find this statement to be evidence of sexual harassment. Interestingly, in the letter there are allegations that Arasteh was compelled to "physically deliver[ ] flowers to my manager's [Doe's] secretary" and made to attend elementary writing courses while not being allowed to participate in other courses.

These are cited as examples of discrimination. In her brief, however, Arasteh contends that these incidents are examples of Doe's retaliation for Arasteh complaining to him about his sexual harassment. *Compare* Cawley Letter, App.Def.Br.Opp.Sum.J. at B–446 *with* Def. Ans.Br.Opp.Sum.J. at 13; *see also* note 6, *supra*.

15. Arasteh attacks Weaver's credibility by pointing out that Weaver spoke to Nelson subsequent to his filing of a complaint against MBNA. Weaver stated that at the time he spoke to Nelson, he was "not aware of any lawsuit" or that he had filed a charge with the E.E.O.C. This point, however, is immaterial to the court's resolution of the issues at this stage in the case since it cannot make credibility determinations.

does not know of any internal investigation into Arasteh's complaints or any attempt by MBNA to counsel her in any way. To Weaver, the reason for this stance was that once someone files a complaint against MBNA, they are treated differently than those who do not file a formal complaint (either in court or with an administrative agency).

On or about January 26, 1998, Dimsey replaced Doe as head of Industry Relations, thereby becoming Arasteh's direct supervisor. The record is silent as to the reason for this shift but there is no evidence that the personnel move was in any way related to Arasteh or her allegations. Upon becoming the head of Industry Relations, Doe and Dimsey had "take over" discussions in about how the department ran. During the course of these conversations, Dimsey stated Doe told him that "there was some litigation between the company and . . . Arasteh and that since it didn't [sic] involve me nobody was going to—it had been suggested I didn't [sic] become aware of any more details than that." This was the only conversation Doe and Dimsey had regarding Arasteh's complaints. Dimsey also spoke with other MBNA personnel about Arasteh's complaint and was told "to approach this with a totally open mind and not be involved in that [the dispute]." [16] Other than these conversations, Dimsey did not know anything else about Arasteh's complaint or dealings with the company. To him, the matter was between Arasteh's and MBNA's attorneys.

On February 2, 1998, MBNA's outside counsel sent a letter in response to the January 21 letter to Cawley. The letter states:

> I have completed my investigation into the allegations contained in your letter of January 21, 1998. In sum, please be advised that there has been no confirmation of any of the claims of discrimination and harassment. . . . What I have learned is that your client is a competent performer who has resisted MBNA's good faith efforts to help her overcome her shortcomings that were holding her back from achieving even more. The assignment about which she is apparently unhappy was designed to give her an opportunity to improve in those areas where she is weakest.

Arasteh contends that the statements in the letter contradict Boehl's testimony to the effect that when Arasteh left his department she was "improving". Furthermore, Arasteh points to Doe's statement that as of January, 1998 "there was noting prohibiting. . . . [Arasteh] from getting promoted".[17] Contrary to Arasteh's assertions, Doe's 1997 year end review states that there were areas that "needed improving" and that she needed to "step back at times and evaluate priorities." Although his review does not mention her opportunity for advancement at MBNA, in a November 26, 1997 file memorandum, Doe stated he felt "[Arasteh's] results were not overly exceptional and did not warrant a promotion at this time . . . [but] this did not preclude her from a possible promotion in 1998. . . ."

The parties dispute the propriety of Arasteh's conduct in Industry Relations during Dimsey's tenure and the reasons for her behavior. MBNA contends that Aras-

---

16. Dimsey testified that he spoke with "Mr. Spartin". Elsewhere, the record indicates that Mr. Spartin oversaw Dimsey in some capacity.

17. At his deposition, Arasteh's counsel asked Doe if Arasteh had any "shortcomings." Although Doe stated he did not know what Arasteh's counsel meant by "shortcomings," he testified that he was "not aware of any" in January, 1998.

teh took frequent breaks and left work for several appointments, including visits to the physical therapist, her doctor and her psychiatrist, as well as attending to her ailing father. Although Arasteh's brief does not specifically separate her attendance issues under Doe and Dimsey, she states that in 1998 she worked more hours in Industry Relations than she was required. Additionally, the parties contest whether Arasteh was present in the office when Dimsey was traveling for business. Again, the court will not detail each party's allegations and the facts supporting them. In order to resolve the instant motion, it is sufficient to note that during this time Arasteh was out of the office for various reasons and that Dimsey believed that it adversely affected the performance of the department.[18] Additionally, Dimsey testified that "around the end of the first quarter," he and Arasteh discussed "how things were going." Although Arasteh prepared a list of goals, he disagreed with her assessment and he "indicated that there were some things that needed attending to."

On April 29, 1998, Arasteh and Dimsey went to lunch. Arasteh showed him a copy of the memorandum she had written to Weaver which detailed her complaints against MBNA. Arasteh told Dimsey that she was "extremely angry with Mr. Boehl for his treatment of her and she had some complaints against Mr. [Doe]." Dimsey replied that since Arasteh had decided to bring a legal action, she needed to talk to "the lawyers" rather than to him. During lunch, Dimsey commented that he was sur-

prised that Arasteh still wanted to work at MBNA, given her "strong negative feelings" about the company. According to Dimsey, Arasteh responded by stating, in substance, that:

> she was only staying with the company because it was a better place to sue . . . from and she had no interest in doing a good job, she had no interest in supporting officer goals, and . . . that she was sorry for me because I was put in this position, which I took [to mean] that I was going to have to put up with her not being particularly motivated because that's [sic] the way she wanted it to be.

Arasteh does not dispute these statements. Instead, Arasteh confirmed that she was not leaving MBNA since she believed that she had not done anything wrong and that staying at the company would put her in a better position to "focus on . . . [her] case".

As her immediate supervisor, Dimsey prepared a 1998 mid year evaluation of Arasteh.[19] Neither party disputes that the evaluation was dramatically lower than her previous one.[20] In the "Manager's Comments" section of Arasteh's evaluation, Dimsey wrote:

> [Arasteh] has been in Industry Relations for three years and should be able to do the job very well. However, she has decided to do the minimum she believes is necessary to do the job. She shows little enthusiasm, or desire to do things well. She tries to shift responsibility to others, rather than assuming it herself. She initiates very little on her own. Although she knows, and I have

---

18. In his deposition, Dimsey stated, "[a]ll I know is when I called in and tried to reach her and questions came in and they tried to reach her, that there were many occasions where she couldn't [sic] be located."

19. The evaluation covered the period from January to June, 1998.

20. Arasteh received five "not achieved" ratings in the "Results and Assessments" category. In the "Management Factors" category, Arasteh received one "satisfactory" ranking and nine "unsatisfactory" rankings. Attached to the "Officer Global Assessment" form was a brief reason for each ranking.

made it clear, that it is important some-one be in the office or readily available, she takes considerable time off to handle personal matters during business hours. She should try harder to schedule her absences at other times. Breaks for lunch and coffee tend to be long. As a result, she is not able to adequately support the Industry Relations Depart-ment and assist me when I am out of the office. Her attitude and absence from work place [sic] contributes to projects not getting done properly or on time. She is not receptive to direction. Her manner of treating ... my Executive Assistant is on occasion insensitive and unprofessional. She does not meet the expectations of an officer of MBNA.

In the past month, she has shown much more diligence and follow through [sic] in completing assignments. She can clearly do the job if she wants to, but she must decide to do it on a con-tinuing basis. To perform better just prior to an evaluation is not enough.

Prior to delivering his evaluation to Aras-teh on July 31, 1998, Dimsey spoke with Doe and the legal department.[21] Based on these conversations, Dimsey decided to have a witness present at Arasteh's evalua-tion and a security guard in the area who would, if necessary, escort her "out of the area".[22] Arasteh neither saw—nor did Dimsey utilize—the security guard. White testified that she did not recall Ar-asteh raising her voice or otherwise acting

inappropriately. Arasteh signed the evalu-ation. She made no written comments and there was no discussion between Arasteh and Dimsey about the evaluation at that time or subsequently.

At some point during the summer of 1998, Arasteh was transferred from Indus-try Relations to the Quality Assurance de-partment. MBNA characterizes the move as lateral while Arasteh contends it was "organizationally a demotion" since she was "further removed" from senior man-agement and her assignments were "less significant". Arasteh's new supervisor, Cynthia Rydel, testified that she did not ask for a new employee but that the de-partment was "backlogged." Further, the backlog related assignments involved data input work, which was not something a vice president would normally do. Aras-teh testified that Rydel told her she did not have a vice president position open at the time but that she was "just told to give me projects." Arasteh maintains that an insurance project which "excited her" was taken away after one week. When she asked why the project was stopped, Rydel told her that a change in management in the insurance department meant the pro-ject was put on hold.[23]

There is scant evidence in the record regarding the impact of Arasteh's transfer. Although the parties contest whether she received a smaller bonus or salary raise in response to Dimsey's evaluation, there is

**21.** Dimsey stated that he decided to speak to Doe "[b]ecause I was surprised that the per-formance of ... [Arasteh] was in my view so far from what I would have expected that I asked him what his perceptions were when he worked with her in terms of her performance. And he told me about the rating he had given her [in 1997] which apparently displeased her and the emotional reaction to the conversa-tion." After giving Arasteh her 1997 year end evaluation, Doe wrote a file memorandum detailing what he felt was unprofessional con-

duct by Arasteh during the evaluation. *See supra.*

**22.** The third party present at the evaluation, Marsha M. White of the Personnel depart-ment, stated that she had never been at an evaluation where a security guard was sta-tioned nearby.

**23.** The record does not indicate whether the project continued or whether Arasteh re-sumed working on it.

no record evidence to suggest that Arasteh's salary was reduced or that there was any change to her bonus or salary after her transfer to Quality Assurance. Indeed, Arasteh maintained her classification as a vice president. Although the record is less than clear, it suggests that it is "possible [but] not likely" that Arasteh will ever receive a promotion. Weaver testified on this issue at his deposition. Both parties overstate Weaver's testimony. Arasteh characterizes Weaver's testimony as "it is possible ... [but] unlikely that she [Arasteh] will be promoted in the remainder of her career." MBNA, in contrast, argues that Weaver offers nothing more than a personal opinion that is nothing more than "speculation". At his deposition, Weaver actually stated that he was not aware of any executive vice presidents "in the company" who have sued MBNA.[24] At a certain point in time, however, Arasteh was "happy" with her new responsibilities in Quality Assurance.[25]

On September 21, 1998, Arasteh sent Dimsey a letter which responded to the criticisms articulated in his 1998 mid year evaluation. In the letter, Arasteh stated that she had documentation to refute Dimsey's negative comments and that she believed that the evaluation was in retaliation for her filing a charge with the E.E.O.C. The parties dispute the purpose of the letter. At the bottom of each page of the letter, Arasteh stated "Information presented in this package is deemed 'CONFIDENTIAL' [sic] and should only be used in relation to my allegations against my employer, MBNA American Bank, N.A." Although the letter was addressed to Dimsey, the letter indicates that copies were sent to Cawley, Weaver, Boehl, John Scheflen (MBNA's General Counsel), Arasteh's attorney and the E.E.O.C. On October 7, 1998, White sent Arasteh a letter stating that Dimsey was out of the country but he would provide her with an "appropriate response" when he returned.[26] White testified that someone at MBNA told her to send the letter and what information to include.

Upon his return, Dimsey wrote a response to Arasteh's letter and submitted it to MBNA's legal department rather than passing it on to either Arasteh or his manager. Dimsey stated that although this was not his usual procedure, since "there was litigation in process, I believe [sic] that was the correct thing to do." Although no one specifically told him to submit his comments to the legal department, Dimsey had, on a prior occasion, been instructed that he was to inform the legal department of all issues and complaints related to Arasteh. After sending his response to the legal department, Dimsey

24. Weaver's deposition errata sheet slightly clarifies this statement by averring that he understood the question to be whether Arasteh could be promoted after suing MBNA. In addition to reiterating his testimony from the deposition, Weaver stated that he was "just speculating about her future prospects". Weaver did not specifically testify about Arasteh's prospects for promotion after her transfer to Quality Assurance.

25. At her deposition, Arasteh stated that after her positive 1999 evaluation she received additional responsibilities. She was allowed to design her own goals and was put in charge of two major systems—the group exclusions

list system and the suppression system—which she viewed as better responsibilities than she previously had. Arasteh also went on disability leave for approximately four months beginning in early 1999. MBNA gave her 100% of her compensation while she was out. Upon her return, nothing changed—"it was like picking up from where I had left off."

26. It appears that Arasteh forwarded her copy of White's letter to her attorney. At the bottom of the letter, there is a handwritten note from Arasteh dated October 13, 1998, which states "... FYI I just rec'd [sic] this memo from MBNA."

never communicated with Arasteh, either verbally or in writing, regarding his evaluation. Arasteh never received a written response to her letter rebutting Dimsey's "negative comments" from anyone at MBNA.

Arasteh filed her charge of discrimination against MBNA with the E.E.O.C. on May 12, 1998. She appended a long attachment which appears to be comprised of excerpts of her memorandum to Weaver and a "Sexual Harassment Questionnaire". The E.E.O.C. issued a right to sue letter on January 21, 1999, stating that it was "unable to conclude that the information obtained establishes violations of the statutes." Arasteh timely filed this action. It appears from the record that as of approximately May 11, 2000, Arasteh continued to work at MBNA in the "communications area."

## IV. DISCUSSION

Although the factual background is somewhat involved the court's analysis is relatively straightforward. Arasteh's sexual harassment claim cannot succeed since (1) she is barred, on statute of limitations grounds, from asserting her allegations and (2) her allegations fail substantively. Nevertheless, the presence of a genuine issue of material fact prevents the court from granting MBNA summary judgment on Arasteh's retaliation claim since a reasonable jury could find for her.

### A. Sexual Harassment

In its motion, MBNA claims that it is entitled to summary judgment both on procedural and substantive grounds. The court agrees with MBNA that Arasteh's allegations of sex discrimination are both time-barred and fail to satisfy her prima facie burden. The court will, therefore, enter judgment in MBNA's favor on this

claim. The court will discuss these issues in turn.

### 1. Procedural Grounds

A claim of employment discrimination under Title VII must be filed with the E.E.O.C. within 180 days of the last alleged discriminatory act. *See* 42 U.S.C. § 2000e–5(e). There is an exception, however, to the 180 day E.E.O.C. filing period. If a state elects to defer to the E.E.O.C., then the 300 day statute of limitations period becomes applicable for claims filed with that federal agency. *See Seredinski v. Clifton Precision Products, Co.,* 776 F.2d 56, 61 (3d Cir.1985) (quoting 42 U.S.C. § 2000e–5(d)). Delaware allows claimants who file either with the E.E.O.C. or the Delaware Department of Labor to rely on the 300 day statute of limitations. *See* 29 C.F.R. § 1601.13(a)(3)(iii). Since Arasteh filed a claim with the E.E.O.C., she is entitled (and limited) to pursuing claims of sexual harassment which occurred no more than 300 days prior to the date of her filing. *See Davis v. Calgon Corp.,* 627 F.2d 674, 677 (3d Cir.1980) (citing *Bean v. Crocker Nat'l Bank,* 600 F.2d 754, 757–59 (9th Cir.1979)).

Arasteh filed her charge of discrimination with the E.E.O.C. on May 12, 1998. MBNA argues that she may not assert a claim for any incident alleged to have occurred before July 17, 1997—300 days before the May 12 filing date. In response to this contention, Arasteh asserts that the "continuing violation" doctrine allows her to include incidents prior to July 17, 1997. As the Third Circuit stated, "[t]he continuing violation theory allows a plaintiff [to] pursue a Title VII claim for discriminatory conduct that began prior to the filing period if ... [she] can demonstrate that the act is part of an ongoing practice or pattern of discrimination." *Rush v. Scott Specialty Gases, Inc.,* 113 F.3d 476, 481 (3d Cir.1997) (internal quotations omitted).

To take advantage of this theory, however, Arasteh must demonstrate that Doe committed at least one act of sexual harassment within the 300 day filing window. *See id.* Moreover, the harassment cannot be an isolated or sporadic act of discrimination; it must be part of a continuing pattern. *See id.* The key factors for the court are (1) the similarity of the subject matter of the alleged acts of discrimination before and after the relevant date, (2) the frequency and/or the occurrence of the alleged acts, and (3) the degree of permanence "which should trigger an employee's awareness of and duty to assert . . . [her] rights." *See id.* at 481–82; *see also Parker v. State, Dep't of Pub. Safety,* 11 F.Supp.2d 467, 473 (D.Del.1998) (citing *Rush* and other cases). Therefore, the crucial questions before the court are (1) whether the record reveals that Doe sexually harassed Arasteh on or after July 17, 1997, and (2) whether the incident was part of a pattern of sexual harassment that began before that date. If Arasteh is able to adduce evidence to answer both of these questions affirmatively, she can recover damages for the entire violation, and more important, the 300 day filing period will not act as a bar.

Arasteh's brief does little more than offer the conclusory argument that the continuing violation theory applies to her case.

In support of her position, Arasteh merely states that Doe began rubbing her legs and staring at her breasts "between March and June 1996 . . . and continued ·,. . by the time she received her end of the year 1996 evaluation."[27] Arasteh also makes two vague allegations that (1) the harassment was continuous between June· and December 1996 and (2) "it continued into 1997." As noted above, however, the 1996 incidents are irrelevant since they only apply once a continuing violation is established. Arasteh neither states when in 1997 Doe allegedly sexually harassed her or describes the incident(s) with any particularity.[28] Since the court must construe any ambiguities in the record in Arasteh's favor, the court will assume—without deciding—that whatever happened in 1997 occurred after the 17th of July.

Determining the character of the allegations, however, is a different matter. Arasteh's papers filed in opposition to the instant motion contain little description of the incident(s). The court will, therefore, examine the record in an attempt to decipher Arasteh's vague allegations of harassment in 1997. Arasteh filled out a "Charge Questionnaire" on April 24, 1998. Although she alleged other discriminatory acts aside from sexual harassment, she stated that the most recent alleged harm occurred on November 19, 1997.[29] Else-

27. In her brief, Arasteh argues that Nelson's testimony establishes that he witnessed Doe rubbing her leg during a meeting. Regardless of whether Arasteh accurately characterizes Nelson's testimony, he did not state when the conversation or the meeting occurred.

28. Arasteh states that she does not remember if Doe stared at her breasts in 1997. She explains her failure to make a note of the 1997 incident(s) as an attempt "to stay professional." Additionally, it appears that any incident of Doe rubbing Arasteh's legs may have happened well before July 17, 1997. At her deposition, Arasteh stated that she did not have any notes about such a 1997 incident

since "[they occurred] during 1996, and I didn't make notes about things like that at the time." *See supra* (describing Arasteh's reasoning for not reporting alleged sexual harassment).

29. Although the Charge Questionnaire states "see .attached sheets for details," Arasteh did not include additional sheets in her papers. *See* Pl.Ans.Br.Sum.J, App. Vol. 2, at B–377. MBNA's materials include a "Sexual Harassment Questionnaire" dated April 19, 1998 which may or may not be the relevant addendum. *See* Def.Br.Sum.J., App. Vol. 2, at A–307–51. Given the uncertainty, the court is unsure whether this ·document was attached

where in the record, a "Sexual Harassment Questionnaire" describes an incident on November 19, 1997, in which Doe yelled at her and directed her to sign out when she left the department. Arasteh stated that the consequence of this incident was that Doe and his secretary began losing respect for her. In addition to the incident on November 19, 1997, the addendum to the E.E.O.C. charge also includes two allegations concerning incidents after July 17, 1997. The allegations are that (1) on November 7, 1997, Doe paged her, used an "insulting tone" in front of Arasteh's "peers," asked her where she was and told her she should be at the office to discuss an office matter, and (2) on November 4 and 13, 1997, Arasteh attended a basic writing course but was not invited to an upper level seminar on December 10, 1997.

■ Despite the difficulties in characterizing these allegations as acts of sexual harassment, the court consider whether the interaction on November 19, 1997 (or other incidents in 1997) was part of a pattern or practice of sexual harassment that began earlier. An examination of all the above described incidents which allegedly occurred after July 17, 1997 reveals that none of them, even taken together, are sufficient to find a continuing violation.

The post July 17, 1997 incidents are not similar to the other earlier incidents (and are unrelated to each other). In November and December, 1997, Doe chastised Arasteh for being late, instructed her to sign out of the office, and required her to attend certain seminars. These acts are completely different, both in terms of subject matter and motivation, than inquiring about Arasteh's marriage, discussing with a co-worker whether Arasteh was a lesbian, asking her to lunch, staring at Arasteh's chest or breasts and rubbing her legs under the table at meetings. Although the alleged pre July 17, 1997 incidents did not occur within a work context or involved non-work related issues, the later situations were entirely employment related. Indeed, Arasteh concedes as much in her brief by identifying several of the post July 17, 1997 incidents as examples of Doe's retaliation rather than sexual harassment. See Pl.Ans.Br.Sum.J., at 13. Affording Arasteh every inference, the court concludes that, at best, the post July 17, 1997 incidents are retaliation for earlier charges of sexual harassment, not harassment itself.[30]

Interestingly, Arasteh's contention that Doe's harassment was part of a pattern that began in 1996, and "continued into 1997," serves to undermine her reliance on the continuing violation theory. More specifically, given Arasteh's comments regarding the frequency and the tenor of the alleged incidents, there is no dispute that she was aware of the harassment well before July 17, 1997, but merely chose not to file until much later. The continuing violation doctrine was not developed to allow plaintiffs unlimited time to file a discrimination claim. See Parker, 11 F.Supp.2d at 473 (citing cases). The purpose of the doctrine is to afford a plaintiff time to "appreciate that [she is] being discriminated against ... [by] liv[ing] through a series of discriminatory acts and is thereby able to perceive the overall discriminatory pattern." See id. According to Arasteh's own testimony, the bulk of the harassment took place in 1996. See note

to the E.E.O.C. Charge of Discrimination or the Charge Questionnaire. Moreover, the document in question appears to be little more than excerpts of the letter Arasteh sent to Weaver in January, 1998.

30. At her deposition, Arasteh stated that the main problem in 1997 was that Doe "made my life miserable" and that most of the harassment was in 1996.

30, *supra.* If the harassment was as severe and pervasive as she alleges, Arasteh should have filed a complaint with the E.E.O.C. at the beginning of 1997, at the absolute latest. *See Parker,* 11 F.Supp.2d at 473 (*citing Stewart v. CPC International, Inc.,* 679 F.2d 117, 120 (7th Cir.1982)) (stating that "a violation of Title VII occurs and triggers the time limit for filing a charge when the employee knew or should have known that he or she was discriminated against") (internal citations and quotations omitted).

Under any scenario, the court cannot transform Arasteh's statement that Doe's sexual harassment "continued into 1997" into the quantity or quality of evidence that establishes that there was at least one discriminatory act within the relevant 300 day period. Since Arasteh cannot overcome this procedural hurdle, the court must enter judgment in favor of MBNA on her sexual harassment claim.

### 2. Substantive Grounds

 Even if the court were to excuse Arasteh's procedural defects, her sexual harassment claim must still fail. Her claim is predicated upon the alleged existence of a hostile work environment.[31] The determination of whether a hostile environment exists is made on a case-by-case basis after considering the totality of the circumstances. *See Andrews v. City of Philadelphia,* 895 F.2d 1469, 1482–84 (3d Cir.1990); *see also* 29 C.F.R. § 1604.11(b). The *Andrews* court announced five elements plaintiffs must meet to assert such claims: (1) the employee suffered intentional discrimination because of her sex, (2) the pervasiveness and regularity of the discrimination,[32] (3) the discrimination detrimentally affected the plaintiff, (4) the

discrimination would detrimentally affect a reasonable person of the same sex in the same position and (5) the existence of respondeat superior liability. *See Andrews,* 895 F.2d at 1482; *see also Calloway v. E.I. DuPont de Nemours and Co.,* C.A. 98–66–SLR, 2000 WL 1251909, at *3–*4 (D.Del. Aug.8, 2000). The court finds that the incidents Arasteh describes fail to meet the first two elements of the *Andrews* test. Since she cannot satisfy these two "essential elements" of her prima facie case, the court need not address the other three parts of the *Andrews* test. *See id.* at *7 & n. 11.

### a. Arasteh's Discrimination Claims Are Not Gender Based

 Sexual harassment is not limited to explicit sexual advances or remarks. *See Andrews,* 895 F.2d at 1485 (stating "[t]o constitute impermissible discrimination, the offensive conduct is not necessarily required to include sexual overtones in every instance or that each incident be sufficiently severe to detrimentally affect a female employee"). Gender, however, must be a substantial factor in the discrimination; Arasteh must show that she would not have been treated the same way if she were a man. *See id.; see also Calloway,* 2000 WL 1251909, at *4 (citing cases). Such a determination is obvious where the allegations involve sexual propositions, innuendo, pornographic materials or sexually derogatory language. *See Andrews,* 895 F.2d at 1482, n. 3. Nevertheless, the "mere utterance of an epithet, joke, or inappropriate taunt that may cause offense" is not actionable under Title VII. *See Weston v. Pennsylvania,* 251 F.3d 420, 427 (3d Cir.

---

**31.** The other type of sexual harassment claim—quid pro quo harassment—is not present in this case.

**32.** The *Andrews* court stated the harassment must be severe and pervasive. *See infra* for discussion on whether this test is correct in light of Supreme Court precedent.

2001); *see also Clark Cty. Sch. Dist. v. Breeden,* — U.S. —, 121 S.Ct. 1508, 1510, 149 L.Ed.2d 509 (per curiam); *Oncale v. Sundowner Offshore Serv., Inc.,* 523 U.S. 75, 81–82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). Where the claims are not sexual by nature, the court must engage in an intensively factual analysis. *See Andrews,* 895 F.2d at 1482 & n. 3.

In this case, most of Arasteh's allegations of sexual harassment are not "sexual by nature." Doe's inquiry regarding the state of Arasteh's marriage and the recounting of his was general and Arasteh did not appear to take offense at the time.[33] His lunch invitation and his statement that Arasteh should socialize more appear to be work related.[34] The fact that Doe required Arasteh to sign in and out of the department and denied of her request to attend one seminar while making her attend a different one will not support a finding that these acts were born of gender related animus. Certainly, Arasteh has not adduced any evidence in the record to the contrary. Giving every inference to Arasteh, the only allegation which could conceivably be based in gender-related animus is Doe's alleged query to Nelson regarding Arasteh's sexual orientation.[35]

Considering the totality of the circumstances, the other allegations are both too vague and not sufficiently sexual in nature to allow the court to find that they were motivated by perceptions about womanhood or gender stereotypes of appropriate female behavior. *See Andrews,* 895 F.2d at 1483–83.

### b. Arasteh's Claimed Sexual Harassment Was not Pervasive or Regular

As an initial matter, the parties dispute whether Arasteh must demonstrate both the frequency and the severity of the sexual harassment. The Supreme Court has recently reaffirmed its position that "sexual harassment is actionable under Title VII only if it is so severe *or* pervasive as to alter the conditions of the victim's employment and create an abusive working environment." [36] *See Breeden,* 121 S.Ct. at 1509 (emphasis added and internal quotations and brackets omitted) (citing cases). In this case, however, Arasteh fails to meet even the more lenient standard for her claims.

To determine whether a hostile work environment is sufficiently severe or pervasive, the court must look at all the

---

**33.** In her deposition, Arasteh stated that she made a joking response to Doe's alleged statement.

**34.** Indeed, Doe suggested Arasteh socialize more since she was in a marketing environment. Other courts have rejected similar comments as evidence of gender based animus. *See Calloway,* 2000 WL 1251909 at *5 & n. 8 (finding supervisor's statement that plaintiff should be "more social" did not raise triable issue even where plaintiff interpreted comment to mean that she should "flirt" with her male co-workers).

**35.** The court notes that Nelson's testimony did not establish the context or the motivation behind the alleged question. In the absence of any motivation ascribed to Doe for asking

the question, the court assumes—without deciding—that it had some gender-related animus. The isolated question, however, is not enough to permit Arasteh's claim to proceed. *See infra* at section IVA(2)(b).

**36.** Several courts have noted the apparent confusion and conflict in the Third Circuit. *See, e.g. Newsome v. Admin. Off. of the Courts of New Jersey,* 103 F.Supp.2d 807, 817, n. 12 (D.N.J.2000), The *Calloway* court decided to apply the "severe and pervasive," following a then-recent Third Circuit opinion which, in turn, relied on Supreme Court case law. *See Calloway,* 2000 WL 1251909, at *5, n. 9. Since *Breeden* is a more recent pronouncement from the Court (and states it is in line with precedent), the court will apply the "severe or pervasive" standard.

relevant circumstances surrounding the discriminatory conduct *See Harris v. Forklift Sys.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). The court should judge the objective severity of the harassment and can consider (1) the frequency, (2) the severity, (3) whether it is physically threatening or humiliating (rather than an offensive utterance), (4) whether it unreasonably interferes with employee's work performance and (5) the effect on employee's psychological well-being. *See id.* No single factor is required or dispositive. *See id.* As the Court stated,

> [t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed. Common sense, and an appropriate sensitivity to social context, will enable courts ... to distinguish between simple teasing or roughhousing ... and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.

*Oncale,* 523 U.S. at 81–82, 118 S.Ct. 998.

Considering all the facts and circumstances surrounding Arasteh's claims of sexual harassment, the court concludes that no reasonable person could find them "severely hostile or abusive." Doe's comments about Arasteh's relationship with her husband and his suggestion she socialize more were merely casual statements. Indeed, Arasteh brushed them off and thought nothing of them at the time. Doe's question about Arasteh's sexual orientation was not made in her presence; it was merely repeated to her by a co-worker.

The allegation which gives the court greatest pause—that Doe rubbed her legs and stared at her chest or breasts in meetings an unspecified number of times—is also not sufficiently severe or pervasive. As to severity, Arasteh's own "additional comments" from her translated diary notes state, "[h]e [Doe] was staring at me and touching my legs and it made me very uncomfortable.... I usually did not note these things. To me they were immaterial and I would handle them." [37] Arasteh's vague allegations make it difficult to determine the frequency of the alleged actions by Doe. As to pervasiveness, Arasteh alleges that soon after Doe began rubbing her legs at meetings, she began arriving at meetings late so as to avoid sitting next to him. Although she would sometimes find herself sitting next to Doe, it "didn't [sic] happen often." This type of sexual harassment allegation is not enough to fall within the strict frequency requirements of relevant precedent. Finally, Arasteh's claim that Doe stared at her chest and/or breasts is too vague, undated, and unsupported for the court to find that it, alone, could constitute sexual harassment under the circumstances.

Given the current state of the record and weighing all the relevant circumstances, the court finds that no reasonable person could conclude that Doe's actions constituted sexual harassment. Arasteh cannot demonstrate that much of Doe's conduct was explicitly sexual. *See Calloway,* 2000 WL 1251909, at * 6 (describing cases which found hostile work environments) *see also Oncale,* 523 U.S. at 80, 118 S.Ct. 998 (stating "[w]e have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex

---

37. *See* note 5, *supra* for a discussion on when these notations were made. Although it appears that they were made after the fact, they also seem to be an explanation to her attorney of her feelings at the time.

merely because the words used have sexual content or connotations"). Based on the evidence in the record, the two allegations that come the closest—asking Nelson whether she was a lesbian and rubbing her legs and staring at her chest or breasts—were not sufficiently "severe or pervasive" to constitute sexual harassment within the meaning of Title VII. Although the court must, at this stage of the proceedings, grant Arasteh every inference, it will not engage in the kind of speculation necessary to overcome the significant factual gaps in the record.

### B. Retaliation

■■■■ To establish a prima facie case of discriminatory retaliation, Arasteh must demonstrate that (1) she engaged in a protected activity under Title VII, (2) MBNA took an adverse employment action against her, and (3) there is a causal connection between Arasteh's protected activity and MBNA's action. *See Weston,* 251 F.3d at 429 (citing cases); *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1299 (3d Cir.1997) (citing cases). Once Arasteh makes out a prima facie case, the burden shifts to MBNA to clearly establish, through the introduction of admissible evidence, legitimate, non-discriminatory reasons for the adverse employment action. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). The burden then shifts back to Arasteh to rebut MBNA's proffered evidence as pretextual. *See id.* Although both parties agree that Arasteh engaged in protected activity (she sent letters to Weaver and Cawley as well as filed an E.E.O.C. complaint), they disagree as to whether she can satisfy the second and third elements of her prima facie case.

■■■ An "adverse employment action" other than discharge or refusal to hire must alter the employee's "compensation,

terms, conditions, or privileges of employment, deprives him or her of employment opportunities or adversely affects his or her status as an employee". *See Robinson,* 120 F.3d at 1300 (internal quotations, brackets and citations omitted); *see also Burlington Indus. v. Ellerth,* 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (stating that "[a] tangible employment action constitutes a significant change in employment status such as hiring, firing, *failing to promote, reassignment with significantly different responsibilities* or a decision causing a significant change in benefits") (emphasis added).

The parties spend a significant amount of time discussing Dimsey's 1998 mid year evaluation of Arasteh. The record, however, is largely silent on her transfer to Quality Assurance in the summer of 1998. MBNA contends that Arasteh's transfer was lateral, that she suffered no loss of pay or classification, and continued to receive raises and bonuses. As mentioned above, MBNA paints Arasteh as an employee who was merely complaining that the transfer resulted in her reporting to a less senior manager and that her new assignments were less interesting. To support its position, MBNA cites numerous cases which hold that undesirable work assignments and lateral transfers are not "tangible employment actions." *See* Def. Br.Sum.J. at 33–34.

The record, however, is not as clear as MBNA would lead the court to believe and raises other possible issues. Although Arasteh may be complaining about undesirable work, she has also adduced evidence which could lead a reasonable jury to determine that she was reassigned with significantly different responsibilities and that her chances of advancement or promotion at MBNA are restricted. As mentioned above, the record reveals that (1) Rydel, Arasteh's new supervisor in Quality Assur-

ance, stated at her deposition that she did not ask for an additional employee, (2) at the time of the transfer there were no openings for vice presidents in Quality Assurance, (3) the character of the work available was things that a vice president would not normally do and (4) someone at MBNA told Rydel to "just give . . . [Arasteh] projects." These facts could suggest that Arasteh was not merely complaining about assignments but that there was a substantial negative—and lasting—change in her responsibilities, and that this change may have been in response to her complaints of harassment.

Furthermore, Weaver's testimony regarding Arasteh's chances for promotion raises more questions than it answers. As noted earlier, although both parties would have the court believe that Weaver's comments unequivocally support its position, the record is not so clear. Weaver actually stated that (1) he believed it was "possible [but] not likely" that Arasteh would ever receive a promotion, and (2) he was not aware of any executive vice presidents "in the company" who have sued MBNA.[38] Since Weaver does not fully explain his comments further,[39] the court would have to speculate as to both his reasons for believing Arasteh was unlikely to get promoted and the meaning of his testimony regarding executive vice presidents who have sued MBNA. Since, at this stage in the proceedings, the court cannot fill in the evidentiary gaps with its own view, it finds that there are genuine issues of material fact whether Arasteh suffered an adverse employment action.

■ There are also genuine issues of material facts surrounding the third step of the prima facie test—a casual connec-

tion between Arasteh's protected actions and the possible adverse employment consequences. As with the second prima facie element, the parties do not sufficiently discuss Arasteh's transfer to Quality Assurance. Although it is true that temporal proximity must be "very close" to establish a causal connection, *Breeden*, 121 S.Ct. at 1511 (citing cases), the facts, as demonstrated by the record, could support other inferences. For example, Weaver—who is organizationally above Arasteh at MBNA—stated his doubts about her chances of future promotion. Given Weaver's long involvement in the case and his failure to explain his reasoning, a reasonable jury could determine that there is a causal link above and beyond mere timing. Furthermore, the record is unclear on who ordered Arasteh's transfer, when the decision was made, and why it was made.

In addition to the record raising genuine issues of material fact regarding Arasteh's prima facie case, the court also believes that there are open questions regarding MBNA's reason for the transfer. Put simply, MBNA has not offered any evidence as to why Arasteh was transferred. Although a possible inference may be because of Arasteh's alleged poor performance in the prior months, there is no evidence of this. Indeed, there is no testimony from anyone at MBNA regarding how and why the decision to transfer Arasteh was made. In the absence of such an explanation, the instructions to Rydel could appear suspect to a trier of fact.

By declining to grant MBNA summary judgment on Arasteh's retaliation claim, the court will not comment on the strength or weakness of either party's additional contentions and declines to evaluate the

---

**38.** Since Arasteh is a vice president, it appears that her next promotion would be to the executive vice president level.

**39.** *See* note 24, *supra* (describing Weaver's errata sheet from his deposition)

other evidence in the record. Most important, the court will not discuss Arasteh's claim that Dimsey's 1998 mid year evaluation was retaliatory or otherwise characterize the record on that issue. Rather, the court concludes that Arasteh has adduced sufficient specific evidence that could result in a finder of fact determining that her transfer to Quality Assurance was retaliatory. *Cf. Shelton v. Univ. of Med & Dentistry of N.J.*, 223 F.3d 220, 227 (3d Cir.2000) (agreeing with district court that plaintiff's "generic speculation that lateral transfers may result in long term economic consequences as to ... [her] career prospects" was insufficient to raise factual dispute on failure to reasonably accommodate claim under Title VII).

## V. CONCLUSION

The duty of the court, at this stage of the proceedings, is to determine whether there are genuine issues for trial, not to impose its view of the evidence on the parties. After reviewing the record and analyzing it in light of the relevant law, the court concludes that Arasteh cannot, as a matter of law succeed on her sexual harassment claims since they are either time-barred or do not rise to the level of sexual harassment under Title VII. The court, however, finds that there are genuine issues of material fact which preclude it from ruling, as a matter of law, that MBNA did not retaliate against Arasteh by transferring her from one department to another. The court issued an order in anticipation of this memorandum opinion on May 24, 2001 (D.I.131).